887 So.2d 419 (2004)
Danielle WATON, Appellant,
v.
Craig WATON, Appellee.
No. 4D02-4828.
District Court of Appeal of Florida, Fourth District.
October 27, 2004.
Rehearing Denied December 22, 2004.
*420 Cynthia L. Greene of the Law Offices of Greene, Smith & Associates, P.A., Miami, and Andrew L. Salvage of Andrew L. Salvage, P.A., Fort Lauderdale, for appellant.
Jonathan M. Streisfeld, Roberta G. Stanley and Kenneth A. Gordon of Brinkley, McNerney, Morgan, Solomon & Tatum, LLP, Fort Lauderdale, for appellee.
*421 STONE, J.
We affirm the trial court's order upholding the validity of an antenuptial agreement.
We recognize that the result in this dissolution after eighteen years of marriage is harsh. Wife has not worked full time in thirteen years, while Husband is now making a very large salary and has a net worth of over three million dollars. As a result, Husband is left with considerable wealth and income, while Wife waived all rights to alimony and equitable distribution by signing an antenuptial agreement. It is undisputed that the agreement is patently unreasonable. However, if an unreasonable agreement is freely entered into, it is enforceable. Casto v. Casto, 508 So.2d 330, 334 (Fla.1987).
The primary issue considered in this appeal is whether Husband made a full and fair disclosure of his net worth and income to Wife at the time of the antenuptial agreement, allowing Wife to make a free and voluntary relinquishment of her property rights to Husband's assets. As there is substantial, competent evidence supporting the trial court's decision, we find no abuse of discretion.
The parties decided to get married after living together for six months. The marriage date was set to be six weeks after their decision. Husband had been previously married and divorced. Due to the prior divorce experience, Husband insisted upon an antenuptial agreement. Wife, a native of Morocco, was 34-years-old when she decided to marry Husband. In the face of conflicting testimony, the trial court expressed reluctance to believe Wife's evidence as to the extent to which she understood English. Husband testified that English was the only language spoken by the couple throughout the relationship. Although Wife spoke four languages, English was the only language Husband understood. Wife also obtained a "GED" degree and passed a cosmetology exam and a licensing exam for insurance sales agents in English.
At no time prior to, or during, the signing of the agreement did Wife indicate that she did not understand the legal consequences and terms of the agreement. The agreement provided that Husband was entitled to all the property he currently owned and "any hereinafter acquired, including any salary or income or dividends from such assets or interests." Similarly, Wife was to retain all the property she owned and any later acquired property. The agreement also stated that in the event the marriage dissolved, neither party would be entitled to any sort of monetary support from the other.
Exhibit A to the antenuptial agreement is a list of assets owned by Husband. This list included all of Husband's assets with their corresponding values. Several of the assets, however, although described, did not include an expressed valuation, but stated: "value unknown as of the date hereof," "exact value unknown," or "value unknown and undetermined." Two such valuation descriptions applied to Husband's interest in two businesses that have never had any significant value and are essentially moot. However, a major asset with such non-stated value was the interest Husband owned in America's # 1 Life and Health Insurance, Inc., the company where he worked. The agreement recognized that Husband owned a 25% interest, soon to be 33 1/3% interest, in that business. At trial, a certified public accountant, called by Husband, testified that at the time of the marriage, the value of Husband's interest in the business was $386,000.
The antenuptial agreement was prepared two weeks before the wedding date. *422 Both parties were represented by counsel when the antenuptial agreement was executed, although Wife selected her attorney from a list of names suggested by Husband's attorney. Wife's attorney testified that he did not specifically remember her, but is certain of his representation because he signed the certificate of attorney. He confirmed the accuracy of his certificate, essentially stating that the attorney went over the antenuptial agreement with Wife and that he advised her of the legal significance of the agreement and its impact on her property rights.
In its ruling, the trial court emphasized it did not find Wife's testimony credible and concluded: First, that the subject antenuptial agreement was not the product of fraud, overreaching, misrepresentation, undue influence, duress or coercion by Husband. Second, that Wife had a reasonable and proximate knowledge of Husband's net worth and income based upon the information provided to the Wife by Husband at the time the antenuptial agreement was signed.
We take the facts most favorably in support of the trial court's decision. See San Martin v. State, 717 So.2d 462, 469 (Fla.1998). Furthermore, "the findings of the trial court come to this court clothed with a presumption of correctness and will not be disturbed absent a showing that there was no competent evidence to sustain them." Baker v. Baker, 394 So.2d 465, 468 (Fla. 4th DCA 1981); see also Schreiber v. Schreiber, 795 So.2d 1054, 1057 (Fla. 4th DCA 2001); Snedaker v. Snedaker, 660 So.2d 1070, 1072-73 (Fla. 4th DCA 1995).
We initially conclude that the trial court did not abuse its discretion in rejecting Wife's claim that the agreement was induced by duress and coercion. Wife claims her case is similar to Hjortaas v. McCabe, 656 So.2d 168 (Fla. 2d DCA 1995). In Hjortaas, the wife was asked to sign a prenuptial agreement two days before the wedding, leaving her "only one day to seek counsel from her own attorney, to make an independent evaluation of the contract, or to cancel her wedding." Id. Further, she did not previously know the agreement's terms and no information was in the agreement regarding her husband's finances. Id."The timing of the signing of the document indicates that ... [the wife's] signature was the product of duress." Id.
This case is clearly distinguishable. Here, Wife received the agreement two weeks before the wedding; Husband had told Wife about the proposed terms long before the agreement was prepared; he made a list of his assets and showed them to Wife before contacting a lawyer to draft the antenuptial agreement. We note that the court, in Hjortaas, indicated that if the wife in that case had known of the proposed terms three weeks earlier, when the couple met with the husband's attorney, that fact would have made it less likely that she signed under duress. Id.
Further, here, Husband told Wife that before they could get married, there would have to be an antenuptial agreement in which she would agree that she would not receive anything from him. There is also testimony that even if the parties did not get married because Wife did not agree to sign the antenuptial agreement, Husband would not have terminated the relationship and the couple would have continued to live together. Furthermore, unlike Hjortaas, the actual agreement in this case does contain Husband's financial information.
Wife also argues that the agreement was a product of overreaching. See Tenneboe v. Tenneboe, 558 So.2d 470 (Fla. 4th DCA 1990); McGregor v. McGregor, *423 447 So.2d 994 (Fla. 4th DCA 1984). However, we find each of the authorities relied on to be distinguishable.
Unlike Tenneboe, this case does not involve a situation where Wife agreed to pay her income to Husband. At the most, this agreement withdraws Husband's support from Wife, anticipating that she would support herself. Here, also, Wife was represented by counsel and she has not made any allegations that Husband, or his attorney, made misrepresentations to her. Here, unlike the circumstances in McGregor, the property in question was never Wife's property, and the agreement provides that each spouse will keep their property separate.
This court has previously recognized that even though an agreement is one-sided and unfair, that alone does not make it the result of overreaching. Schreiber.
Wife asserts that even if she does not prevail as a result of her claims of duress, coercion, and overreaching, she is entitled to prevail under the second ground recognized in Casto and Del Vecchio v. Del Vecchio, 143 So.2d 17 (Fla.1962).[1]
For guidance, we look to Del Vecchio and Casto.[2] These authorities require that, under these circumstances, the challenging spouse have "a general and approximate knowledge of ... [the other spouse's] property and resources," Del Vecchio, 143 So.2d at 21, and "a general knowledge of the income of the parties." Casto, 508 So.2d at 333. Here, there is no dispute that Wife had knowledge of Husband's income at the time of execution. Therefore, our focus is on whether there is record support for a conclusion that Wife had a general and approximate knowledge of Husband's property and resources.
Under this second ground, to establish that an agreement is unenforceable, the challenging spouse must satisfy a two-prong test. First, that the agreement makes an unfair or unreasonable provision for that spouse, given the circumstances of the parties. Casto, 508 So.2d at 330 (citing Del Vecchio, 143 So.2d at 20). Second, after establishing the agreement is unreasonable, a rebuttable presumption arises conceding that there was either concealment by the defending spouse or a presumed lack of knowledge by the challenging spouse of the defending spouse's finances at the time the agreement was reached. Id. The presumption shifts the burden to the defending spouse, who may rebut these presumptions by showing that there was either:
(a) a full, frank disclosure to the challenging spouse by the defending spouse before the signing of the agreement relative to the value of all marital property and the income of the parties, or (b) a general and approximate knowledge by the challenging spouse of the character and extent of the marital property sufficient to obtain a value by reasonable means, as well as a general knowledge of the income of the parties.
Id. at 333.
In this case, the antenuptial agreement was indisputably unfair and unreasonable, and the agreement is certainly "disproportionate to the means" of Husband. Id. (quoting Del Vecchio, 143 So.2d at 19-20); see also Fleming v. Fleming, 474 So.2d 1247, 1248 (Fla. 4th DCA 1985)(stating that if "an instrument provided for the *424 wife to get nothing at all, it would be simple to find it unfair on its face."). Therefore, the first prong of the test is satisfied and the presumption arises that Husband attempted to conceal his finances or that Wife had no knowledge of Husband's finances. The burden, then, falls on Husband to prove that he disclosed his assets or that Wife had knowledge of them.
As to the disclosure, "there must be a full, frank disclosure as to the value of all the marital property." Casto, 508 So.2d at 330. This includes a "good faith disclosure by the prospective husband of the material facts relating to the character and value of his property." Stated otherwise, Husband is required to disclose such information regarding his assets as to provide Wife with:
a general and approximate knowledge by her of the prospective husband's property. The term "approximate" is, for this purpose, held synonymous with "near", "close to" or "approaching" .... And while the disclosure should be full, fair, and open, it need not be minutely detailed nor exact. The test is the adequacy of the knowledge of the woman  she must have had some understanding of her rights and a general and approximate knowledge of his property and resources. The basic issue is concealment, not the absence of disclosure, and the wife may not repudiate if she is not prejudiced by lack of information.
Del Vecchio, 143 So.2d at 20.
The disclosure is necessary to show that the spouse "possessed such general and approximate knowledge of his property as to enable [the spouse] to reach an intelligent decision to enter into the agreement." Del Vecchio, 143 So.2d at 21 (emphasis added). See also Casto, 508 So.2d at 333 (two alternative means of rebutting the presumption of concealment or lack of knowledge, one is full frank disclosure by the defending spouse and the other is general and approximate knowledge of the "character and extent of the marital property sufficient to obtain a value by reasonable means, as well as a general knowledge of the income of the parties.").
Here, Husband listed the actual value of his various accounts and holdings except for his three business interests. As to the only one of significant value, the question is whether the following language may be construed by the trial court as a full, frank disclosure:
25% interest soon to be 33 1/3% interest in America's No. Life and Health Agency, Inc., which has an address of 4624 Hollywood Boulevard, Hollywood, Florida
* * *
Exact value unknown but see note below:
* * *
* *Stock ownership interest:
Note on America's No. 1 Life and Health Agency, Inc.  Corporation itself makes approximately $750,000.00, a year gross on renewal commissions on current policies, deductions are made from the gross commissions to pay the respective agents their proportionate or required commissions. Corporation makes approximately $1,000,000.00 a year gross on new policies, but from these sums payments are made to cover, salaries, office overhead, and general operating expenses of the office.
Here, as Wife knew that Husband owned part of the business and knew his income, the remaining question is whether her general knowledge was sufficient for one to obtain a value "by reasonable means." Id. Significantly, there is no indication *425 in the record that Husband had any more information as to valuation than that disclosed to Wife, and there is no suggestion that any equity or assets of the business were in any way secretly set aside for the future benefit of Husband. Here, also, Wife did not make trade offs in the agreement, or otherwise rely upon misleading disclosure information to her detriment. Wife also never sought clarification or additional information. The court could conclude from the record that, whatever an appraised value might be, Wife accepted that she would receive nothing.
Further, the record reflects that an expert would have been needed to accurately value the business. We do not read into Del Vecchio or Casto a requirement imposing a duty on Husband to hire an expert to determine a valuation of his interest in the agency before the parties could marry. To so hold would mandate that all parties entering into such agreements first obtain a professional appraisal of business or professional interests, even without proof that such appraisal could be accomplished within the time remaining prior to the marriage, and at reasonable cost, and with the data and information available.
We cannot conclude, on this record, that the court could not reasonably conclude that Wife was provided with sufficient general and approximate knowledge of Husband's net worth and income, or that the order is an abuse of discretion.
Therefore, the order is affirmed.
WARNER, J. and BRYAN, BEN L., Associate Judge, concur.
NOTES
[1] We note that Casto and Del Vecchio involved post-nuptial agreements. They are, nevertheless, controlling as to pre-nuptial agreements. See Posner v. Posner, 233 So.2d 381 (Fla.1970).
[2] We have considered Casto, notwithstanding that it was issued after the agreement in this case was executed.